*Reversed and remanded.*

Judges all present and concurring.

---

## JOHN PURYEAR V. THE STATE.

*No. 6256.   Decided June 22.*

1. **Murder.—Indictment** for murder described the deceased as the "infant child of Essie Puryear, said child being without name." *Held* sufficient, and tantamount to the allegation that the name of the deceased was unknown to the grand jurors.

2. **Same—Circumstantial Evidence—Charge of the Court.**—To instruct the jury upon the law of circumstantial evidence is the imperative duty of the trial court when, for conviction, the prosecution relies solely upon that character of evidence. See the opinion for evidence *held* to develop two inculpatory theories, both resting on circumstantial evidence; wherefore, the court failing in the first instance to charge the jury upon the question, and in the second instance refusing a special instruction thereupon, committed material error.

3. **Same—Accomplice Testimony.**—The proof establishing the complicity of the principal State's witness as an accomplice to the crime, the trial court erred in omitting to instruct the jury that in order to warrant the conviction of the defendant upon the testimony of the said witness, legal corroboration thereof was indispensable.

4. **Same—Practice.**—Upon the ground that he was under arrest and was not cautioned, the defendant objected to proof at this trial of his actions and conduct at the examining trial during the time his accomplice was testifying. *Held*, that under the proof in this case the objection was well taken, and should have been sustained. If the proof supported the assumption of the State that the accomplice claimed to have been intimidated by the defendant at the examining trial, and for that reason gave testimony on that trial contradicted by her testimony on this trial, then indeed the evi-

dence would be admissible, whether he was cautioned or not, to corroborate the accomplice as to intimidation, but for no other purpose, and it would devolve upon the court to so instruct the jury.

5. **Murder—Corpus Delicti.**—Article 549 of the Penal Code provides that "no person shall be convicted of any degree of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of the killing." See the opinion and the statement of the case for evidence *held* insufficient to establish the *corpus delicti.*

Appeal from the District Court of Hunt. Tried below before T. D. Montrose, Esq., Special Judge.

This conviction was for murder of the first degree, a life term in the penitentiary being the the penalty assessed against the appellant.

With the exception of the facts noted below the case against the appellant appears from the narrative of Essie Puryear, whose testimony in chief is embodied in the opinion of the court. Her cross-examination disclosed no additional material fact, beyond eliciting contradictory testimony given by her on the examining trial, and her admission that such contradictory testimony was false.

Several witnesses testified that they saw Essie Puryear recently before the alleged murder of the child, and that, judging from her physical appearance, they then believed her to be pregnant. By other witnesses it was shown that a few days after the alleged murder of the child, two bloody quilts were found in the upstair room of the house, and that certain bloody female garments were found in a box in the smoke house on the place, which said box was covered with a man's slicker. It was also shown by the testimony of one or two witnesses that they carefully examined a quantity of ashes taken from the fire place in which, according to the statement of Essie Puryear, the body of the child was burned, and that they found certain consumed bones. No witness undertook to identify the said bones as human bones, and a physician testified that he was not able to distinguish the ashes of human bones from the ashes of animal bones.

*Perkins, Gilbert & Perkins, M. M. Brooks,* and *L. D. King,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

Hurt, Judge.—Appellant was indicted for the murder of an infant child of Essie Puryear—the child being without name—in Hunt County, on the 13th day of March, 1888. The case was tried at the January term, 1889, resulting in a conviction for murder of the first degree, with imprisonment for life assessed as the penalty. Hon. E. W. Terhune, judge of that district, being disqualified, having been of counsel for defendant,.

the case by agreement was tried by Hon. T. D. Montrose, special judge.

Appellant moved to quash the indictment because the name of the child was not given, nor was it alleged that its name was unknown to the grand jury. The indictment states that the appellant "did * * * with malice aforethought kill an infant child of Essie Puryear, said child being without name." It is contended by counsel that this description of the party killed is not sufficient.

Article 425 of the Code of Criminal Procedure provides as follows: "In alleging the name of any person necessary to be stated in the indictment, when the name of such person is unknown to the grand jury that fact shall be stated, unless the person be the accused, and if this be the case a reasonably accurate description of him shall be given." *If the name is unknown to the grand jury that fact shall be stated.* Evidently if the person has no name the name could not be known to the grand jury. Hence, the allegation that the child was without name is equivalent to alleging that the name was unknown. The person killed is alleged to be the child of Essie Puryear, and this child is alleged to be without a name. This is equivalent to alleging that the family name of the child was Puryear, and that its christian name was unknown to the grand jury. Hence we have certainty to a common intent, which is sufficient.

We give a statement of the case by adopting for that purpose the testimony in chief of Essie Puryear: "My name is Essie Puryear. I am living at my father's, E. J. Maples, sixteen miles from Greenville, Hunt County, Texas. I am now twenty years old. I was married in January, 1885, to Pierce Puryear. My husband died March 20, 1887. At the time of my husband's death the defendant John Puryear was living with us, and continued to live with me after my husband's death. No one lived on my place except the defendant John Puryear and my little boy. My place is about a quarter of a mile from my father's house. My sister-in-law, the defendant's sister, Mrs. Lucy Ballew, lived with us from the time of my husband's death until in August, 1887. I was eighteen years old when my husband died. No one except as above stated ever lived in the house with me and defendant at any time. We had no hirelings there at any time.

"On the morning of the 13th day of March, A. D. 1888, I gave birth to a child; it was near daylight, and no one was present but defendant. I told him before the birth of the child that I couldn't stand it by myself, but he said I could stand it without some one as well as with them. While I was giving birth to the child the defendant pressed on my knees, and he delivered the child. There were three rooms to my house, one room being upstairs, and two downstairs. The child was born downstairs in the front room. After he delivered the child he went to the fireplace to get a string to tie the cord. The baby cried, and I called the defend-

ant to come and tie the cord. He then came and took the child upon his left arm, and took it out of the room into the side room, and I heard him pouring water on something, and then he came back into my room, and I asked him where the child was, and he said he had it 'out there all right.' I asked him where, and he replied, 'out there in the water.' The defendant then made up a fire, went into the side room, and returned with the child between some wood. I saw it, and asked him what he was going to do with it, and he said he would burn it. He then put the wood and baby into the fire, and I said, 'Oh, John, don't do that!' The child did not make any noise, and had made none since he had carried it out of the room. I had heard him pouring the water out in the side room after he took the child out there. When defendant threw the child and wood in the fire, and I said, 'Oh, John, don't do that!' he did not make any reply, but turned towards me and smiled. I was flooding at the time, was very weak, and said nothing else about the child at the time. After a little I told defendant to get me some water—that I was flooding. He kept a large fire all day, and kept the door shut and the window curtains down. It was a warm morning, and defendant was in his shirt sleeves. His shirt was patched at the elbow. The shirt was originally blue, but had faded until you could not tell its color. He kept this shirt on until Sunday morning, when he pulled it off. He got some blood on the left sleeve of his shirt close to the wrist.

"We doubled up a quilt for me to have the child on. I don't know what he did with the quilt. He said he took the underclothes I had on, to-wit, a gown and a chemise, and wrapped them up in his slicker and put them in the smoke house. The gown and chemise had blood on them. After defendant put the child in the fire he kept fire up all day. He punched in the fire, and said he didn't believe that thing would burn. John Puryear, the defendant, was the father of my child that was born March 13, 1888. I never asked about the child after he burned it, but a few days after its birth he told me it was a fine child and a boy; that he intended at one time to get Dr. Youell to destroy the child, but it had ended so well he was glad he had not got Dr. Youell. I was not unwell since June, 1887, and commenced showing pregnancy in October and November, 1887. About the middle of October, 1887, the defendant brought me some medicine in a bottle and told me to take it. I took one dose, and wouldn't have taken that but he was standing there. I was afraid of the medicine. I was afraid it would kill me. I got sick and sent for Dr. Swofford in the middle of October, 1887, and he came and made some examination of me. The medicine was marked as ergot. I threw it away after taking the first dose. I went to my father's house several times in the fall of 1887, and I suppose they saw there was something the matter with me. I never told it to any one at my father's, and they never spoke to me about it. I and John Puryear were both arrested on Monday morn-

ing, March 19, 1888, and carried before Squire O'Neal at my father's house, and then when I was sworn to I told about the birth of the child. There were several present. I was weak and sick, and lay down on the bed to testify. The defendant sat at the foot of the bed. Dr. Swofford examined me after the child was born. The child had no name, and it was born and died in Hunt County, Texas."

It will be readily perceived that if killed at all the child must have been drowned or burned to death, the circumstances tending strongly to show that its death, if it was killed, was caused by drowning. If drowned, we have a case resting purely upon circumstantial evidence. If burned to death, we have a case of positive evidence—assuming that the child was living when placed on the fire. If it was not living when placed on the fire, then the theory that it was burned to death is not in the case except as the fact that the body was thus disposed of may tend to show express malice, assuming that defendant had murdered the child by drowning it.

Back then to the question as to the methods by which the child was killed. If drowned, then a case of circumstantial evidence. The facts demonstrate this proposition. Being a case of circumstantial evidence, the rules applicable to such a case should have been given in charge to the jury. This was not done, though such instructions were prepared and requested to be given by counsel for defendant. This was error, unless it is absolutely certain that the child was burned to death. Was this the case? By no means, for the proof tends more strongly to show that it was drowned. Essie Puryear does not state that the child was living when placed on the fire. If the child was living when placed on the fire this fact is established by circumstances, and hence we have a case of circumstantial evidence upon either theory relied upon by the State. But let us concede for the argument that the circumstances—the facts— were in such close juxtaposition that they amount to positive proof that the child was burned to death, still the theory that it was drowned might have been adopted by the jury, and the defendant convicted upon that theory, without proper instructions upon the rule applicable to a case depending upon circumstantial evidence.

When we look to all the facts and circumstances in this case we are irresistibly impressed with the conviction that Essie Puryear was an accomplice to the murder, if in fact the child was murdered. Now, the learned judge instructed the jury that they could not convict upon the testimony of an accomplice unless corroborated as the statute requires, defining an accomplice, but made no direct application of the rule to the facts of the case. This omission was observed by counsel for defendant, and charges were prepared and requested to be given making such application of the rule to the particular case. These were refused, which was error.

Appellant being present, was under arrest without caution when Essie

Puryear was being examined by the magistrate.   Over his objection the State proved his actions—conduct.   This was error.

But it may be contended that as Essie Puryear contradicted herself in material matters, and gave as a reason for so doing "that she was intimidated by the defendant," the State had the right to introduce in evidence what he said or did in corroboration of Essie that she was so intimidated. Now, when we look to the record we find that Mrs. Puryear does not intimate that she was intimidated by the actions of defendant at the examination before the justice.  · She says, in explanation of her failure to disclose certain important facts to the justice, that "it was because defendant had threatened to kill me."   She does not state when or where these threats were made.   Evidently they were not made either upon the first or second examination.   Then his conduct could not have been admissible to corroborate her statement regarding threats.   But suppose the conduct of appellant at the last examination tended to corroborate Essie's statement that he had threatened her if she disclosed the crime. Upon this hypothesis his conduct would be admissible though he was under arrest and without caution.   But it would be admissible for but one purpose only—to corroborate Mrs. Puryear's statement that she had been threatened by defendant if she disclosed the crime.   This being the case, it was of the highest importance to the rights of defendant that the court tell the jury that such testimony could only be used for that purpose, and that his conduct could not be used as a criminative fact against him.   This was not done.

Counsel for appellant contend that the evidence fails to establish the death of the child with that degree of certainty required by the Code. This is a very serious question.

The Code provides that "no person shall be convicted of any degree of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of the death of the person charged to have been killed."   Penal Code, art. 549.   Now, we assert that the death of the person charged to have been killed can be proved in no other manner—by no other evidence or circumstances than those named in the statute.   The dead body or a portion of it *must* be found.   The body or a portion thereof must not only be found, but must be *identified* as the body or a portion of the body of the person charged to have been killed.   The death of the person must be established by proof of these facts, and the death can not be established by any other evidence or cir-  . cumstance short of such proof.   This the law requires, and whether this provision be wise or unwise is not for this court to determine.   We will remark, however, that the fearful results consequent upon any other rule being adopted and followed are well known to all thoughtful readers and students of criminal jurisprudence.

Let us apply the rule to the facts of this case.   It is the theory of the

State that the child was either drowned or burned to death. The question arises, was it seen dead? Was its dead body found? Was it dead when seen by its mother at the time it was placed on the fire? If not, the proof fails to show that the dead body was found. The mother saw the child placed on the fire. She did not know whether it was alive or not. Was a portion of the body found after this in the fire place? This must be shown. How? By finding a portion and identifying it as a part of the body of the child. Was a portion found? If so, this record fails to disclose the fact. Some bones were found. Were they human bones or those of some other animal? Here again we are left in the dark completely. Looking to all the facts and circumstances bearing upon this subject, one would naturally conclude that the child was dead; and in just such cases and upon just such proof of the death of the deceased, at common law for a long period of time, convictions were sustained; yea, upon less cogent proof. But it was, no doubt, the conviction and execution of innocent persons upon this character of proof that inspired the enactment of article 549 of the Penal Code. While guilty parties may escape by virtue of its provisions, this is preferable to the conviction of the innocent. We could cite hundreds of cases in which the innocent have been punished under the old rule, which did not require the body or a portion of it to be found, but we believe it unnecessary. We are of the opinion that the death of the child is not shown by such proof as the law requires.

Again, the evidence showing or tending strongly to show that Essie Puryear was an accomplice, and she being the only witness testifying to facts tending to show that the child was dead, it was necessary that she be corroborated on this point or fact, and the court should have so instructed the jury. This was not done.

For the errors above noted the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Judges all present and concurring.

| 28 | 79 |
| 28 | 505 |
| 29 | 337 |

| 28 | 79 |
| 30 | 557 |
| 30 | 606 |
| 31 | 90 |
| 31 | 607 |
| 32 | 278 |
| 32 | 360 |

| 28 | 79 |
| 33 | 223 |
| 34 | 612 |

| 28 | 79 |
| 36 | 532 |
| 38 | 169 |